UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SPEAR MARKETING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-3583-B |
| | § | |
| BANCORPSOUTH BANK and | § | |
| ARGO DATA RESOURCE | § | |
| COPORATION, | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants' BancorpSouth Bank ("BancorpSouth") and Argo Data Resource Corporation ("ARGO") Motion to Dismiss filed September 27, 2012 (doc. 9). For the reasons listed below, the Motion to Dismiss is **DENIED**.

## I.

## BACKGROUND

This case concerns the alleged theft of Spear Marketing, Inc.'s ("SMI") trade secrets by BancorpSouth and ARGO. Ten years ago, BancorpSouth contracted with SMI to use its proprietary cash management system known as VaultWorks. Am. Compl. 2.[1] VaultWorks was developed by SMI to optimize the amount of cash a banking institution has on hand at its branch and ATM locations to satisfy customer demand and operate profitably. *Id.* at 1. SMI claims that during the past fifteen

---

[1]The First Amended Complaint ("Amended Complaint") has paragraph numbering starting on page 3. The Court refers to the page number of the Amended Complaint where paragraph numbering is not provided.

years it has expended considerable resources to develop and improve VaultWorks, and that over this period it amassed a vast amount of valuable trade secrets, including technical data and information and business information. *Id.* at ¶¶ 16-18. SMI alleges that these trade secrets are kept secure and are only available to a small number of people who work for or on behalf of SMI. *Id.* at ¶ 19. Further, the contract between BancorpSouth and SMI provided that BancorpSouth "agree[d] not to disclose any of [SMI's proprietary] . . . information to anyone except those with a need to know in order to perform" under the Vaultworks Agreement. *Id.* at ¶ 21.

In March 2010, SMI approached ARGO, a developer of products for banks, about the possible sale of VaultWorks for $2 million. *Id.* at 1-2. During a VaultWorks demonstration presented to several ARGO representatives on April 6, 2010, SMI explained that one of its largest customers was BancorpSouth, which was an attractive selling point because BancorpSouth was already using ARGO's product to process its daily teller window transactions. *Id.* ARGO had also expressed an interest in VaultWorks after representing that it neither had a product like VaultWorks nor had it considered developing one. *Id.* Despite this interest, all communications from ARGO to SMI had ceased by the end of May 2010. *Id.* SMI alleges that, during a series of meetings and correspondences about the prospective sale with Todd Robertson, ARGO's Vice President of Marketing, Mr. Robertson misrepresented ARGO's interest in buying VaultWorks and his intention of signing an agreement not to disclose confidential VaultWorks information. *Id.* at ¶¶ 23-24, 28, 32-35. SMI further alleges that ARGO engaged in this correspondence in order to gain access to SMI's valuable trade secrets to create its own system to compete with VaultWorks. *Id.* at ¶ 36. In addition, SMI contends that at some time after an April 2010 demonstration of VaultWorks to ARGO, ARGO conspired with BancorpSouth to misappropriate SMI's trade secrets, leading to BancorpSouth's

termination of its VaultWorks agreement with SMI in January 2012. *Id.* at 2. SMI also alleges that BancorpSouth and ARGO are currently using SMI's trade secrets relating to VaultWorks without SMI's consent. *Id.*

As a result of Defendants' alleged misappropriation, on August 10, 2012, SMI filed its Original Petition in Texas state court asserting claims for violation of the Texas Theft Liability Act, misappropriation of trade secrets, conversion, unjust enrichment, fraud, constructive fraud, breach of contract, tortious interference, unfair competition, and civil conspiracy. Pet. 1-2. On September 4, 2012, Defendants filed their Notice of Removal, alleging that all of SMI's claims were preempted by Section 301 of the Copyright Act and stating that the Copyright Act transforms these preempted state law claims into federal claims for the purposes of the well-pleaded complaint rule. Notice of Removal 2. In response to the removal, SMI filed its First Amended Complaint[2] and its Motion to Remand, which the Court denied on May 16, 2013 based on federal preemption of at least some of the Original Petition's state claims. Defendants filed the instant Motion to Dismiss on September 27, 2012, arguing that SMI's Amended Complaint should be dismissed as SMI's claims are preempted by the Copyright Act. The Motion to Dismiss also argues that the Amended Complaint does not properly allege the elements of its claims. Defendants' Motion to Dismiss is now ripe for the Court's consideration.

## II.

## LEGAL STANDARD

---

[2]The Amended Complaint, filed on September 13, 2012, drops SMI's conversion claim, among other changes.

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K Eby Constr. Co., Inc. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). "A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'" *Tel-Phonic Servs., Inc. v. TBS Int'l., Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992) (quoting *Ward v. Hudnell*, 366 F.2d 247, 249 (5th Cir. 1966)). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations are true," even if doubtful in fact. *Id.* at 555. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

### III.

### ANALYSIS

BancorpSouth and ARGO center the focus of their Motion to Dismiss primarily on the contention that all of SMI's state law claims are preempted by the Copyright Act. They also argue that SMI has failed to plead any of its state law claims with the minimum factual detail required by

4

Federal Rule of Civil Procedure 8(a). Further, they argue that SMI has failed to plead its fraud claims with particularity as required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). Finally, BancorpSouth and ARGO contend that the Amended Complaint does not sufficiently allege the existence of a trade secret and argue that the descriptions of the alleged trade secrets in the complaint are too vague. The Court will address each argument below.

A.      *Are the State Claims Preempted by the Copyright Act?*

In determining whether a state law claim is preempted by the Copyright Act, the Court applies a two-prong test. *Globeranger Corp. v. Software AG*, 691 F.3d 702, 706 (citing *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003)). First, the Court determines whether the claim falls within the subject-matter of copyright. *Id.* Next, the Court looks to whether the state law cause of action protects rights that are "equivalent" to any of the exclusive rights protected by copyright. *Id.* Both prongs of this test must be met for a claim to be preempted. *Id.*

The Court must first determine whether the claim falls under the subject matter of copyright. *Globeranger*, 691 F.3d at 706. The Copyright Act extends protection over "original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a) (2012), but excludes "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work," *id.* at § 102(b).

Defendants argue that all of SMI's alleged trade secrets, "however described by SMI, fall within the subject matter of copyright." Mot. Dismiss 10. They further assert that SMI's claims are essentially premised upon allegations that ARGO and BancorpSouth somehow copied and used SMI's VaultWorks software and related writings to enable ARGO to create its Cash Inventory

5

Optimization software. *Id.* at 19. SMI argues that its trade secrets are excluded from the subject matter of copyright and that its state law claims are therefore not preempted.

The Court, in its previous order denying SMI's Motion to Remand, examined in detail the case law addressing the scope of the subject matter of copyright, which the Court largely repeats here. *See* Mem. Op. May 16, 2013 ("Mem. Op.") at 8-12; *see also Globeranger*, 691 F.3d at 705-09; *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 531 (5th Cir. 1994); *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341-42 (5th Cir. 1994). In *Globeranger*, the plaintiff had developed a passive radio frequency identification ("RFID") system for commercial use, which permitted items with RFID "tags" attached to pass through an area with an RFID reader and the recording of data on those items' movement. *Globeranger*, 691 F.3d at 704. This system also included "business processes and software associated with those business processes" which told the RFID system "how to recognize what the something is, where it came from, where it is going, how long it took to get there, and most importantly what the RFID System should do about it." *Id.* Based on these facts, which are similar to those in the instant case, the *Globeranger* court found that the plaintiff's claims established copying of more than merely expressions through allegations that extended beyond software. *Id.* at 705, 708-09.

In arriving at this conclusion, the *Globeranger* court discussed its decision in *Engineering Dynamics, Inc. v. Structural Software, Inc.*, where it held that while some nonliteral aspects of computer programs fell within the subject matter of copyright, it did not conclude that "copyright protection sweeps so broadly as to encompass whole structures or systems of which software is only a part." *Globeranger*, 691 F.3d at 707 (discussing *Eng'g Dynamics*, 26 F.3d at 1341-42). In *Engineering Dynamics*, the issue was whether computer manuals and data cards that "provided input formats to

6

use in categorizing data such that a computer program could utilize that data" were protected under

the Copyright Act. *Id.* The *Globeranger* court found that "[t]he crucial distinguishing fact between

*Engineering Dynamics* and this case is that even at its broadest point *Engineering Dynamics* is about

software. The current case contains plausible allegations that extend beyond software." *Id.* at 708.

The *Globeranger* court also discussed *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d

527, 531 (5th Cir. 1994). In that case, the Fifth Circuit examined a copyright claim over alleged

copying of the software expression of a specific business model, where the plaintiff's computer

program designed to assist in management decisions contained eight "questions" or "problem

attributions" and five "definitions or processes" – the defendants created a modified program

containing the original questions and definitions but added four new questions. *Globeranger*, 691 F.3d

at 708. The court found that even if the questions and processes conveyed unprotectable ideas, "the

specific words, phrases, and sentences selected to convey those ideas are protectable expression." *Id.*

In contrast, the basic idea of a management training program and the specific idea of training

managers by asking them a series of questions about their decision-making and then suggesting a

preferred decision making process, based on their answers, was not. *Id.* Distinguishing *Kepner*, the

*Globeranger* court found that:

> Even though the allegations in [the plaintiff's] petition include copying of specific
> expressions, it has also alleged the copying of its business practices that are not
> necessarily limited to specific expressions. [Plaintiff's] allegations plausibly establish
> copying of more than the types of copyrightable expressions we discussed in
> *Engineering Dynamics* and *Kepner-Tregoe.*

*Id.* Finally, the *Globeranger* court concluded that the plaintiff's allegations relating to the

implementation of RFID at client sites fell outside the subject matter of the Copyright Act because

they were excluded by Section 102(b). *Id.* at 709.

7

The same analysis is applicable here. At least some of SMI's alleged trade secrets are "not necessarily limited to specific expressions" such as customer lists, business plans, marketing strategies, and customer preferences. Insofar as SMI is alleging claims based on these types of trade secrets, the claims do not fall under the subject matter of copyright and are therefore not preempted by the Copyright Act. The Court expresses no opinion as to which of the alleged trade secrets, if any, are preempted, but finds only that at least some of these trade secrets are not preempted and no further analysis regarding preemption is required at this time. In *Globeranger*, for example, the court, in determining whether the case could remain in federal court, "concluded that at least part of the factual basis for [plaintiff's] claims may fall outside of the scope of copyright," and left "open the application of this holding to the remainder of the copyright preemption analysis on remand." *Globeranger*, 691 F.3d at 709. Similarly, the Court recognizes that once the factual record is developed, the parties' evidence may show that some or all of the state law claims are in fact preempted, and thus the Court may revisit the issue of preemption later in the case.

Given that at least some of the alleged trade secrets are not within the subject matter of copyright,[3] the Court **DENIES** BancorpSouth and ARGO's Motion to Dismiss to the extent it seeks dismissal of the Amended Complaint based on preemption grounds.

B.    *Did the Amended Complaint Properly Allege All the Elements of its Claims?*

Aside from arguing that the Amended Complaint's claims should be dismissed on preemption grounds, Defendants argue that the complaint lacks sufficient detail regarding each claim, arguing

---

[3]As the Court finds that at least some of the trade secrets are not within the subject matter of copyright, the Court is not required to move to the second step of the analysis, whether the state law claims protect rights that are "equivalent" to any of the exclusive rights protected by copyright.

generally that all of the claims are based on misappropriation of trade secrets and that the Amended

Complaint does not properly allege the existence of any trade secrets. Defendants specifically attack

the breach of contract and tortious interference claims but also argue that "[a] similar absence of

factual detail can be found in each of SMI's claims." Mot. Dismiss 18. Further, Defendants argue that

SMI did not meet the requirements of Rule 9(b) in alleging its fraud and constructive fraud claims.

The Court will examine these arguments below.[4]

    1.    <u>Misappropriation of Trade Secrets</u>

    In Texas, to establish a claim of misappropriation of trade secrets, the plaintiff must show "(1)

a trade secret existed, (2) the trade secret was acquired through a breach of a confidential

relationship or discovered by improper means, and (3) the defendant used the trade secret without

authorization from the plaintiff." *Gaia Tech. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir.

1999).

    A trade secret is "any formula, pattern, device or compilation of information which is used

in one's business and presents an opportunity to obtain an advantage over competitors who do not

know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l v. Altai*,

918 S.W.2d 453, 455 (Tex. 1994)). In determining whether a trade secret exists, the following

factors may be considered:

> (1) the extent to which the information is known outside of his business; (2) the
> extent to which it is known by employees and others involved in his business; (3) the
> extent of the measures taken by him to guard the secrecy of the information; (4) the

---

[4]As stated previously, Defendants did not specifically address whether the Amended Complaint
properly alleged all of the elements of every claim, specifically addressing only certain claims and arguing that
each claim failed due to lack of sufficient detail. Given Defendants' contention that the pleading as to each
claim is insufficient, the Court examines the allegations as to each claim.

> value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d at 739 (quoting RESTATEMENT OF TORTS § 757 cmt. B. (1939)). However, not all of these factors need to be satisfied to establish a claim, and other circumstances may also be considered. *Id.* at 740. "Customer lists, pricing information, client information, customer preferences, buyer contacts, blueprints, market strategies, and drawings have all been recognized as trade secrets." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.-Dallas 2009). *See also Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.-Dallas 2008); *see also T-N-T Motorsports v. Hennessy Motorsports*, 965 S.W.2d 18, 22 (Tex. App.-Houston [1st Dist.] 1998, pet. dism'd) (same).

To be a trade secret, the information cannot be readily known or readily ascertainable by independent investigation. *Hogan Systems, Inc. v. Cybresource Int'l., Inc.*, 158 F.3d 319, 324 (5th Cir. 1998). However, trade secret protection is not precluded simply by the fact that the information could be acquired through lawful means such as inspection, experimentation, and analysis. *Am. Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.-Waco 1996). Generally, the relevant issue is how the knowledge is acquired, not how it could be acquired. *Id.*

Despite BancorpSouth and ARGO's argument to the contrary, the Court finds that SMI pleads sufficient facts to show that a trade secret existed. SMI alleges that its trade secrets consist of "know-how, ideas, procedures, processes, systems, methods of operation, and concepts" that fall under the categories of technical data and information and business information, both of which are related to VaultWorks. Am. Compl. ¶ 18. SMI then specifically enumerates the trade secrets as follows:

Technical Data and Information, including but not limited to, the selection of categories of input data used by VaultWorks; "Black Box" formulas, algorithms, and methods of operation used in VaultWorks; selection of categories of output data to be generated by VaultWorks; customer preferences regarding key output data; customer preferences regarding output data to include in reports; and customer preferences regarding organization of output data in reports; and

Business Information, including but not limited to, past, present and prospective customer lists; past, present and prospective customer contacts; marketing strategies; budgets; forecasts and business plans; cost and pricing information for VaultWorks; information about SMI personnel; and financial information about SMI.

*Id.* SMI further explains how these trade secrets relate specifically to VaultWorks and fit within the established categories of trade secrets. SMI then alleges that these trade secrets can be and have been used to gain competitive advantage over competitors. *Id.* at ¶¶ 14-15, 17 (discussing the benefits VaultWorks provides for banks). Moreover, analysis of the factors listed in the Restatement of Torts weighs in favor of finding that the complaint alleges the existence of trade secrets in this case because the complaint alleges that: (1) the information was only disclosed to a small number of people on a need-to-know basis; (2) SMI expended significant effort to develop the trade secrets and guard their secrecy; and (3) it would be difficult for others to acquire this information. SMI in this case has provided specific information about the allegedly misappropriated trade secrets.

SMI also alleges that the trade secrets were acquired through a breach of a confidentiality agreement or through improper means. SMI claims that it had a confidentiality agreement with BancorpSouth whereby BancorpSouth could not disclose SMI's proprietary information to anyone besides those specifically authorized, and that BancorpSouth breached this relationship by disclosing this information to ARGO without SMI's consent. Am. Compl. ¶¶ 21, 37-38. Furthermore, SMI contends that BancorpSouth "surreptitiously retained" the trade secret information after terminating its agreement with SMI. *Id.* at ¶ 48. SMI also claims that ARGO discovered trade secrets through

11

improper means, namely through its collaboration with BancorpSouth and through Mr. Robertson's misrepresentation of his intention to sign the non-disclosure agreement while acting on behalf of ARGO. *Id.* at ¶¶ 31-32, 36.

SMI alleges that both ARGO and BancorpSouth used these trade secrets without authorization to develop a cash-management system to compete with VaultWorks. *Id.* at ¶¶ 39, 41. Finally, SMI claims that it suffered damages as a result of this unauthorized use, including the "lost value of the misappropriated information, lost profits, and the impairment of SMI's future earning capacity and goodwill." *Id.* at ¶ 49. The facts SMI pleads, if true, would establish a claim for misappropriation of trade secrets that is plausible on its face. Therefore, the Court **DENIES** BancorpSouth and ARGO's motion to dismiss SMI's misappropriation of trade secrets claim for failure to state a claim.

2.   Fraud (ARGO only)

To succeed on a claim of fraud, a party must show:

(1) a material misrepresentation was made; (2) it was false; (3) when the misrepresentation was made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in reliance on the misrepresentation; and (6) the party suffered injury as a result.

*Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 292 (Tex. App.—Corpus Christi 2000) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). A decision on a claim of fraud necessarily involves an inquiry into the state of mind of the party making the representations in question.

SMI alleges that Mr. Robertson, acting on behalf of ARGO, made several material misrepresentations about ARGO's interest in acquiring VaultWorks. Am. Compl. ¶ 55. Specifically, SMI claims that "Mr. Robertson indicated an interest in VaultWorks but stated he needed approval from ARGO's CEO Max Martin before he could proceed with such a discussion." *Id.* Furthermore, SMI alleges that ARGO represented that it "did not already have a solution similar to VaultWorks somewhere in the company's development pipeline." *Id.* In addition, SMI alleges that Mr. Robertson, on multiple occasions, promised to sign a non-disclosure agreement. *Id.* at ¶ 56. In essence, SMI argues that ARGO was never interested in purchasing VaultWorks and that Mr. Robertson never intended to sign and return the non-disclosure agreement, but made such representations in order to gain access to SMI's trade secrets. These misrepresentations took place from March through May 2010, and SMI has provided the specific dates for an Internet conference call, a lunch meeting, and several email conversations where the alleged misrepresentations were made. *Id.* at ¶¶ 28-34. Specifically, SMI discusses: (1) an April 6, 2010 Internet conference call where Mr. Spear demonstrated VaultWorks to Mr. Robertson and other ARGO representatives, explained how data from an automated teller system was interfaced directly into VaultWorks and discussed SMI's relationship with BancorpSouth; (2) an April 6, 2010 email from Mr. Robertson containing an unsigned non-disclosure agreement that SMI then signed and returned; (3) an April 15, 2010 lunch meeting where Mr. Robertson again promised to return the non-disclosure agreement and where Mr. Spear and Mr. Robertson further discussed the acquisition and focused on ARGO's integration of VaultWorks, SMI's current and prospective customers, the structure of the potential acquisition, and other topics; (4) an April 21, 2010 email from Mr. Spear to Mr. Robertson containing information reserved exclusively for SMI's existing and prospective customers; and (5) a May 17, 2010 email from

13

Mr. Robertson where ARGO promised to sign and return the non-disclosure agreement and indicated an interest in further acquisition discussions. *Id.* at ¶¶ 28-33.

SMI claims that Mr. Robertson knew that all of the above representations to SMI were false at the time of their making. *Id.* at ¶ 57. SMI then alleges that Mr. Robinson made these misrepresentations to encourage SMI to disclose confidential information and trade secrets. *See id.* ¶ 55. SMI alleges that it reasonably relied on ARGO's representations. *Id.* at ¶ 56. Finally, SMI claims it suffered damages as a result of these misrepresentations, including "the lost value of the misappropriated information, lost profits, loss of goodwill, loss of confidential trade-secret information, and dissipation in the competitive marketplace." *Id.* at ¶ 58.

Claims of fraud are governed by Rule 9(b)'s heightened pleading requirements, which requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). ARGO argues that SMI has failed to meet these requirements. The Court disagrees, as SMI has provided the who, what, when, where, and why of the circumstances of the alleged fraud. "[T]he Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001)). These requirements are intended "to ensure that defendants can effectively respond to plaintiffs' allegations, to prevent the filing of baseless complaints to obtain discovery on unknown wrongs, and to protect defendants from unfounded allegations of wrongdoing which might injure their reputations." *Hernandez v. Ciba-Giegy Corp. USA*, 200 F.R.D. 285, 290 (S.D. Tex. 2001). SMI has met the requirements of Rule 9(b), and its claim is

14

plausible on its face. Furthermore, the Court finds that SMI has provided enough factual information to ensure the purposes of Rule 9 have been fulfilled. Accordingly, the Court **DENIES** ARGO's motion to dismiss SMI's fraud claim.

### 3.   Constructive Fraud

Under Texas law, constructive fraud involves "the breach of some legal or equitable duty which . . . the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964). Unlike actual fraud, constructive fraud does not require any intent to deceive. *Id.*

SMI alleges that there was a legal relationship between it and the Defendants. Am. Compl. ¶¶ 21-22, 28, 60. SMI claims that BancorpSouth and ARGO breached their duties, and that their "numerous self-dealing and deceitful transactions" were fraudulent, regardless of whether there was any intent to deceive. *Id.* at ¶ 60. Since it is a fraud claim, it is subject to the requirements of Rule 9(b). The same analysis from the above fraud claim applies here, and SMI has presented allegations that, if true, would establish a claim for relief. The Court therefore **DENIES** BancorpSouth and ARGO's motion to dismiss SMI's constructive fraud claim.

### 4.   Texas Theft Liability Act

A plaintiff may establish a claim for theft of trade secrets under the Texas Theft Liability Act ("TTLA") by showing that the defendant knowingly stole the plaintiff's trade secret, made a copy of an article representing the trade secret, or communicated or transmitted a trade secret, and that the plaintiff sustained damages as a result. *See* Tex. Penal Code § 31.05; Tex. Civ. Prac. & Rem. Code § 134.005(a). SMI claims that BancorpSouth and ARGO stole SMI's trade secrets. Under the TTLA, "theft" is defined as "unlawfully appropriating property or unlawfully obtaining services." Tex.

15

Civ. Prac. & Rem. Code § 134.002 (2). "Appropriate" means "bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or [] to acquire or otherwise exercise control over property other than real property." Tex. Penal Code § 31.01(4). Types of intangible property, such as trade secrets, are included under this definition of "property." *See id.* at § 31.05(5)(B).

SMI alleges that BancorpSouth exercised control over the trade secrets by using them in the development of ARGO's own cash-management system without SMI's consent and in contravention of its contract with BancorpSouth. Furthermore, SMI alleges that the unauthorized control over its trade secrets by BancorpSouth and ARGO has caused damages to SMI. SMI has not based its pleading on "labels and conclusions" or on a "formulaic recitation of the elements of a cause of action"; rather, it has provided sufficiently detailed background information regarding the nature of the trade secrets, the nature of the relationship between the parties, the details and circumstances of specific interactions, such as those between SMI and Mr. Robertson, and a plausible reason why BancorpSouth and ARGO would have wanted to access the trade secrets and use them commercially. Because SMI alleges that BancorpSouth and ARGO knowingly stole SMI's trade secrets related to VaultWorks and exercised control over these trade secrets without SMI's consent, resulting in damage to SMI, in sufficient detail to establish a claim for relief, the Court hereby **DENIES** Bancorp South and ARGO's motion to dismiss for failure to state a claim under the TTLA.

5. <u>Unjust Enrichment</u>

Unjust enrichment is a quasi-contractual claim which is based on the absence of an express agreement. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683-84 (Tex. 2000). "Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can

be no recovery under a quasi-contract theory" because parties should be bound by their express agreements. *Id.* at 684. "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). It "is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 42 (quoting *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App. – Austin 1987, writ denied)). Unjust enrichment is bottomed on the "equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App. – San Antonio 2004, pet. denied); *see Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App. – Dallas 2006, no pet.).

SMI alleges that BancorpSouth and ARGO took unfair advantage of SMI's trade secrets by using them to develop a competing product after they had obtained the trade secrets through unlawful means. SMI claims that as a result of this unfair advantage, both BancorpSouth and ARGO have unjustly received the benefits of SMI's trade secrets. These facts, if true, form a plausible claim for relief. The Court thus **DENIES** BancorpSouth and ARGO's motion to dismiss SMI's unjust enrichment claim.[5]

---

[5]Some lower Texas courts have held that unjust enrichment may occur when the "'person sought to be charged [has] wrongfully secured a benefit or [has] passively received one which it would [be] unconscionable to retain.'" *Villarreal*, 136 S.W.3d at 270 (quoting *City of Corpus v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App. – Corpus Christi 1987, writ denied)). Others still have expressed the view that unjust enrichment is not even an independent cause of action "but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Walker*, 181 S.W.3d at 900. The Court expresses no opinion as to these issues as Defendants' arguments in their motion to dismiss were focused on preemption and whether the elements of certain claims were properly alleged. The Court

17

6.      Breach of Contract (BancorpSouth only)

To establish a breach of contract claim under Texas law, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages. *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. – Houston [1ˢᵗ Dist.] 2003, pet. denied). For a contract to exist, the parties must manifest their mutual assent to be bound by it. *See Alliance Milling Co. v. Eaton*, 25 S.W. 614, 616 (Tex. 1894).

SMI alleges that there was a valid contract between it and BancorpSouth. Am. Compl. ¶ 21. SMI also claims that it performed its contractual obligations in providing BancorpSouth with the VaultWorks service and methodology. Finally, SMI alleges that BancorpSouth breached the agreement by misappropriating SMI's trade secrets when it had a duty not to disclose this confidential information. *Id.* at ¶¶ 21, 63. SMI further alleges that it has suffered damages as a result of BancorpSouth's breach. *Id.* at ¶ 63. The Court therefore **DENIES** the motion to dismiss with respect to SMI's breach of contract claim against BancorpSouth.

7.      Tortious Interference With a Contract (ARGO only)[6]

To bring a claim for tortious interference with a contract, a plaintiff must show: "(1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was

---

also expresses no opinion as to whether SMI may ultimately recover on both its breach of contract claim and unjust enrichment claim against BancorpSouth, as such issue was not briefed by the parties.

[6]Defendants argue that it is unclear whether SMI has stated a claim for tortious interference with an existing contract or for tortious interference with a prospective business relationship. Defs.' Reply 7. Although SMI's brief does mention both claims, the Amended Complaint is clearly alleging a claim for tortious interference with an existing contract and does not claim interference with a prospective business relationship. *See* Am. Compl. ¶¶ 64-68.

willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred." *Holloway v. Skinner*, 898 S.W.2d 793, 795-96 (Tex. 1995).

SMI has alleged the existence of a contract subject to interference – namely, the agreement between BancorpSouth and SMI whereby SMI provided BancorpSouth with the Vaultworks cash management system and BancorpSouth agreed not to disclose SMI's trade proprietary information. Am. Compl. ¶ 21. SMI alleges that ARGO interfered with this contract by collaborating with BancorpSouth to disclose SMI's trade secrets without authorization and by using these trade secrets to formulate a competing product. SMI further alleges that prior to this interference, ARGO "had no product similar to VaultWorks and had nothing in development regarding the cash management task," *id.* at ¶ 24, and that as a result of the unauthorized disclosure of trade secrets to ARGO, ARGO's system is now a competitor of VaultWorks, *id.* at ¶ 36. SMI alleges that ARGO's conduct proximately caused damages or loss due to the breach of BancorpSouth's contract with SMI. *Id.* at ¶¶ 67-68. Thus, the Court **DENIES** the motion to dismiss with respect to SMI's tortious interference claim against ARGO.

> 8.   Unfair Competition (ARGO only)

Under Texas law, unfair competition "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). This cause of action requires that the plaintiff allege "an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor Publ'g*, 216 F.3d at 486. The illegal act need not violate criminal law, but it must be an independent tort. *Id.*

19

In this case, SMI has alleged several independent torts against ARGO which interfered with SMI's ability to conduct business. SMI claims that ARGO "purposefully misappropriated SMI's Trade Secrets to destroy SMI's competitive advantage in the marketplace and drive SMI out of business," Am. Compl. ¶ 71, and that "ARGO's actions have been willful and with the specific intent to harm SMI in the conduct of its business and to gain an unfair competitive advantage over SMI," *id.* at ¶ 72. SMI pleads enough facts to state a claim for relief that is plausible on its face. The Court therefore **DENIES** the motion to dismiss with respect to SMI's unfair competition claim against ARGO.

9.   Civil Conspiracy

Under Texas law, "[c]ivil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, might be called a derivative tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). In Texas, because conspiracy requires specific intent, one cannot agree or conspire to be negligent. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

A plaintiff must establish the following elements to prove a cause of action for civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Liability for conspiracy depends on participation in an underlying tort. *Tilton*, 925 S.W.2d at 681.

SMI alleges that BancorpSouth and ARGO, together and with common purpose, "conspired and agreed . . . to misappropriate and undermine SMI's Trade Secrets." Am. Compl. ¶ 75. Their

20

object was allegedly to interfere with SMI's "existing and potential contractual and business relations" and to develop "by unlawful means a cash management system for BancorpSouth and others to compete with SMI's VaultWorks." *Id.* SMI further alleges that BancorpSouth and ARGO have taken and continue to take actions "in furtherance of this conspiracy, including but not limited to communicating with each other about SMI's Trade Secrets and using SMI's Trade Secrets pertaining to SMI's proprietary ideas, processes, and/or other methodologies of VaultWorks." *Id.* ¶ 76. The alleged overt acts include "sending emails, conducting meetings, and otherwise communicating with each other about SMI's Trade Secrets." *Id.* at ¶ 78. Finally, SMI alleges that as a proximate cause of the conspiracy and the acts in furtherance of that conspiracy, "SMI has and continues to suffer damages including but not limited to the lost value of the misappropriated information, lost profits, loss of goodwill, loss of confidential trade-secret information, and dissipation in the competitive marketplace." *Id.* at ¶ 81. As SMI has alleged a claim for relief that is plausible on its face, the Court thus **DENIES** BancorpSouth and ARGO's motion to dismiss SMI's civil conspiracy claim.

C.       *Supplemental Jurisdiction*

The Court previously denied SMI's Motion to Remand finding that at least two of SMI's claims in the state petition, the Texas Theft Liability Act claim and the conversion claim, were at least partially preempted by the Copyright Act. Today, however, the Court declines to dismiss any of the state claims in the Amended Complaint based on federal preemption. Plaintiffs argue that if none of their state law claims are preempted by federal law, the case should be remanded to state court. *See, e.g.,* Pl.'s Expedited Mot. Stay Discovery filed June 17, 2013 at 2-3 (citing 28 U.S.C. § 1447(c)).

Even though the Court found federal jurisdiction in this case based on federal preemption, the Court finds instructive cases on supplemental jurisdiction in normal federal question situations.[7] "District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed." *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993); *see also Burns-Toole v. Byrne*, 11 F.3d 1270, 1276 (5th Cir. 1994) (same). In determining whether to maintain jurisdiction after the dismissal of all federal claims, "courts should exercise their discretion in a way that best serves the principles of economy, convenience, fairness, and comity." *Doddy v. Oxy U.S.A., Inc.*, 101 F.3d 448, 456 (5th Cir. 1996) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)); *see also Newport Ltd. v. Sears, Roebuck & Co.*, 941 F.2d 302, 307 (5th Cir. 1991) (same). Generally, however, once all federal claims have been dismissed from an action, these factors counsel in favor of dismissing the state causes without prejudice. *See, e.g., Bunch v. Duncan*, No. Civ.A. 3:01CV0137G, 2002 WL 324287, at *4 (N.D.Tex. Feb. 27, 2002) (citing *Carnegie-Mellon*, 484 U.S. at 350 n. 7).

The Court concludes that under the particular circumstances of this case, the Court should and will exercise its discretion in retaining supplemental jurisdiction over all the state claims in this case. In doing so, the Court notes BancorpSouth's and ARGO's concerns about artful pleading and procedural gamesmanship by SMI. The Court does not express an opinion on these contentions but notes the peculiar procedural posture of this case, where SMI filed a motion to remand shortly after this case was removed and then filed an amended complaint within days of filing the Motion to

---

[7]The issue of supplemental jurisdiction more commonly arises in federal question cases where a court dismisses all the federal claims in a case and then has to determine whether to retain jurisdiction over the remaining state claims.

22

Remand, while the motion was still pending. Further, the case has already been pending in this Court for several months. The Court, in its discretion, finds that the interests of justice and judicial economy will be best served by continuing to exercise jurisdiction over this case.

## IV.

## CONCLUSION

For the reasons listed above, BancorpSouth and ARGO's Motion to Dismiss (doc. 9) is **DENIED**.


SO ORDERED.

SIGNED: July 1, 2013.


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE