UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SPEAR MARKETING, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-3583-B |
| | § | |
| BANCORPSOUTH BANK and | § | |
| ARGO DATA RESOURCE | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Defendants BancorpSouth Bank ("BancorpSouth") and ARGO Data Resource Corporation ("ARGO") move for summary judgment on Plaintiff Spear Marketing, Inc.'s ("SMI") nine Texas state law claims. For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment (doc. 94).[1]

## I.

## BACKGROUND

This case concerns Defendants' alleged theft of SMI's trade secrets. The trade secrets at issue primarily relate to VaultWorks, SMI's software-based solution designed to help banks optimize cash levels. To elaborate, "VaultWorks primary function is to enable banks to reduce the amount of cash"—a non-earning asset—"in bank branches, ATMs, and central vaults, thereby allowing for the

---

[1] In light of this Order, the Court finds SMI's Motion for Summary Judgment (Partial) (doc. 92), based on certain affirmative defenses asserted by Defendants, to be **MOOT**. Likewise, the Court finds **MOOT** the other pending motions, including Defendants' Motion to Strike (doc. 119), Defendants' Motion to Strike Plaintiff's Proffered Experts (doc. 130), and Defendants' Motion in Limine (doc. 170).

repurposing of surplus cash." (Pl.'s Br. Supp. Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp."), Doc. 121, at 4.) Relatedly, VaultWorks provides "information banks need to order the right amounts of cash by denomination from the Federal Reserve Bank." (*Id.* at 4-5.)

After using VaultWorks for nearly ten years, BancorpSouth decided not to renew its "VaultWorks Agreement" with SMI in 2012, instead opting to license ARGO's competing cash management software known as the Cash Inventory Optimization ("CIO") solution. SMI complains that BancorpSouth made this decision after colluding with ARGO to misappropriate SMI's trade secrets. In their Motion for Summary Judgment, Defendants argue that SMI has no evidence to support its allegations. The record reveals the following relevant facts underlying this dispute.

A.      *SMI's and ARGO's Pre-Dispute Business Relations with BancorpSouth*

SMI is a Texas-based company founded in 1997 by its president, Bill Spear. (Pl.'s App. Supp. Resp. Def.'s Mot. Summ. J. ("Pl.'s App."), Docs. 122-125, at 101.) The three employee organization—including Spear, his son Chris and daughter Debbie—offer just one product, VaultWorks, the software for which Chuck Lawson, an independent contractor, developed at SMI's request. (*Id.* at 101, 104, 107, 110.)

VaultWorks, as mentioned, is a cash management solution for banks. SMI protects its intellectual property tied to VaultWorks in a number of ways. First, VaultWorks is an application service provider, meaning customers only access VaultWorks using the internet, while the actual software for the program is housed on SMI's own servers. (*Id.* at 24, 109.) Second, only Bill Spear, Chris Spear, and Chuck Lawson can access SMI's servers hosting VaultWorks' software. (*Id.* at 2891.) Third, SMI's customers can only view the specific user interface screens and reports they are given access to via the internet, and have no way of accessing VaultWorks' software code,

algorithms, or formulas. (*Id.* at 114, 1058.) Fourth, the information SMI's customers access and exchange with VaultWorks is encoded, and each connection receives a unique session key. (*Id.* at 24, 2891.) Finally, SMI's customers access their user interface screens using a password that is provided to a select number of bank employees. (*Id.*)

BancorpSouth, a banking institution based in Tupelo, Mississippi with nearly 300 locations spread across eight states, is one of SMI's former, and largest, banking customers. (Def.'s App. Supp. Mot. Summ. J. ("Def.'s App."), Doc. 96, at 963.) On May 28, 2002, SMI and BancorpSouth entered into an agreement giving BancorpSouth access to VaultWorks for a period of one year, with an option to renew. (Pl.'s App. 2911-13.) The two sides extended their "VaultWorks Agreement" four times, with each extension incorporating all relevant provisions (other than length of services) of the original contract. (Def.'s App. 1050, 1119, 1120.) One such provision provided that the parties "acknowledge that in the course of doing business, each may receive sensitive and/or proprietary information," and therefore jointly "agree not to disclose any of the other's such information to anyone except those with a need to know in order to perform hereunder." (Pl.'s App. 2911.) BancorpSouth and SMI further stipulated that neither party "shall . . . allow any unauthorized party access to SMI's proprietary VaultWorks." (*Id.*)

Well before entering into the VaultWorks Agreement, BancorpSouth formed a long-standing business relationship with ARGO. ARGO is a Texas-based company offering a range of software solutions to financial institutions nationwide. (Def.'s App. 3.) Its 450-plus employees code and develop these solutions to perform a multitude of functions, including credit risk assessment, fraud prevention, and capturing electronic images of checks. (*Id.*) BancorpSouth began using one of these ARGO-developed solutions in June 1993. (*Id.*) At this time, BancorpSouth entered into a licensing

agreement with ARGO regarding an early version of ARGO's teller solution—the BANKPRO Teller—which is generally designed to "automat[e] all the operations a bank teller needs to perform." (*Id.* at 3, 19-31.) Since signing this agreement in 1993, BancorpSouth has continuously employed ARGO's BANKPRO teller solution to automate and manage teller transactions throughout its various locations. (*Id.* at 960.)

    B.    *ARGO Develops and Markets CIO*

    The summary judgment record shows that ARGO began developing a cash management solution to complement its teller solution by as early as 2004. In the initial developmental phase, ARGO hired Dr. Micahael Monticino of the University of North Texas to work on formulas and algorithms for a cash forecasting program that would ultimately drive ARGO's cash management software. (*Id.* at 4, 42.) Thereafter, ARGO invested more than 10,600 man hours—not including Dr. Monticino's work—to complete the developmental work on a cash management solution that came to be known as CIO. (*Id.* at 5, 464-599.) By March 16, 2009, ARGO had declared CIO "market ready" and "Generally Available" for customers. (*Id.* at 5, 601-04.) This means CIO "was fully functional, had been tested and was ready for installation at a customer." (*Id.* at 863.)

    Like VaultWorks, CIO is a cash management solution whose general function is to assist banks in determining optimum cash levels. (*Id.*) CIO, however differs from VaultWorks in at least a few respects made apparent by the record. While VaultWorks tracks a branch's cash in and cash out balances and generates a cash surplus value for the bank to consider (*see, e.g.*, Pl.'s App. 105–106), CIO is driven by cash forecasting algorithms that predict a bank's specific cash needs in light of the bank's historical cash usage activity at its various locations. (*See, e.g.*, Def.'s App. 863) In addition, CIO is directly installed on the bank's computers, and when properly integrated with the

- 4 -

bank's operating systems, automatically draws the historical cash data its forecasting program needs from the bank's teller solution. (*Id.*) This eliminates "the need for branch personnel to manually input cash data" (*id.*), as bank employees must do with VaultWorks. (Pl.'s App. 107-08.)

ARGO first mentioned CIO to BancorpSouth in early 2008. At the time, ARGO was pitching an upgraded version of its teller solution, ARGO's Teller Payments system. (Def.'s App. 6.) This upgraded system included a cash management program, CIO, which ARGO was in the process of developing at that time. (*Id.*) Thus, as part of his February 27, 2008 presentation, ARGO's Vice President Todd Robertson encouraged BancorpSouth's representatives, for the first time, to consider adopting CIO for its cash management needs. (*Id.*) Though ARGO and BancorpSouth continued to discuss Teller Payments and CIO in March 2008, with Robertson even providing BancorpSouth with an estimated price to license CIO, BancorpSouth did not elect to upgrade at that time. (*Id.* at 6, 960.) But ARGO's CIO remained on BancorpSouth's radar over the ensuing two years.

In September 2008, ARGO invited customers to its annual Teller Payments Advisory Board, at which BancorpSouth's representatives witnessed ARGO's presentation on CIO. (*Id.* at 6-7, 720-52, 754-57, 960.) A full year later, ARGO hosted its 2009 Teller Payments Advisory Board, where BancorpSouth's representatives again viewed a presentation on CIO. (*Id.* at 7, 763-90, 960.) And since CIO had been deemed Generally Available and market ready by that time, ARGO was able to perform live demonstrations of CIO's software to interested attendees, including BancorpSouth. (*Id.* at 7, 960.)

In March 2010, Todd Robertson met with BancorpSouth's representatives in a renewed effort to convince BancorpSouth to upgrade to Teller Payments, and implement CIO as part of the upgrade. (*Id.* at 7-8, 960.) At this meeting, BancorpSouth expressed interest in CIO, and proposed

licensing it as a standalone product without upgrading from its BANKPRO Teller solution. (*Id.* at 7-8, 960-61.) Initially, this would not have been possible. CIO was originally designed to integrate exclusively with ARGO's Teller Payments system, which employed graphical user interface ("GUI") in place of the older, text-based interfacing[2] of BANKPRO that BancorpSouth was still using. (*Id.* at 6, 865.) This meant that the historical cash usage data CIO's forecasting engine needed could not be automatically fed into and read by CIO using BancorpSouth's text-based teller solution. (*Id.*)

Nevertheless, following his March 2010 meeting, Robertson spoke with ARGO personnel about integrating CIO with BancorpSouth's text-based teller solution, and they "confirmed . . . that it could be done, but that it would take some additional developmental work." (*Id.* at 8.) Apparently this developmental work involved designing data extraction "software that would deposit the data generated from BANKPRO Teller into the appropriate format to be read by and imported into CIO." (*Id.* at 865.) With that, Robertson emailed BancorpSouth's representatives on April 1, 2010, notifying them that ARGO had a way to integrate CIO with BancorpSouth's existing BANKPRO solution and proposing a meeting later that month to discuss. (*Id.* at 8, 792.) At that meeting on April 29, 2010, Robertson explained to BancorpSouth's representatives how data extraction could be used to integrate CIO with the bank's text-based teller solution, and further discussed how BancorpSouth could use CIO for its cash management needs. (*Id.* at 10-11, 812-16.)

C.      *SMI Contacts ARGO*

In the midst of its campaign to sell BancorpSouth on the CIO Solution, ARGO was

---

[2] GUI is the type of user interface seen in most personal computer todays, allowing users to interact with the program through visuals like mouse-controlled pointers and icons. Text-based interfaces typically require the user to interact with the program strictly through textual commands.

contacted by SMI's president, Bill Spear, who was looking for prospects interested in purchasing VaultWorks or in forming some partnership with SMI. More specifically, Spear called ARGO's Robertson, unsolicited, sometime in mid- to late- March 2010, and left a voice message asking Robertson to call back to discuss ARGO's potential interest in VaultWorks.[3] (Pl.'s App. 2892.)

Soon after, Robertson returned Spear's call and indicated that ARGO may be interested in SMI's product. According to Spear, Robertson said he needed approval from ARGO's CEO before further discussing VaultWorks and "that he needed to confirm ARGO did not already have a solution similar to VaultWorks somewhere in the company's development pipeline." (*Id.*) Robertson apparently told Spear "subsequently . . . that ARGO had no product similar to VaultWorks and had nothing in development regarding the cash management task." (*Id.*)

Following this exchange, Spear emailed Robertson on April 1, 2010 offering to demonstrate VaultWorks to ARGO on April 6, 2010. (Def.'s App. 796.) In his email, Spear attached what appears to be a marketing flyer[4] describing VaultWorks' basic functionality. (*Id.* at 797.) Spear avers that Robertson then called him after receiving this email to confirm "that ARGO was indeed interested in seeing a demonstration of VaultWorks right away." (Pl.'s App. 2892.) According to Spear, he and Robertson "agreed the demonstration would be confidential" during their telephone conversation and agreed that ARGO would provide SMI with a nondisclosure agreement. (*Id.*)

---

[3] The parties present conflicting evidence for certain facts here, such as the precise date Spear contacted Robertson and the substance of their unrecorded conversations. Since these disputed facts are most relevant to Defendants' Motion, the Court views all evidence surrounding these facts in a light most favorable to the non-movant, SMI. *See Haverda v. Hay County*, 723 F.3d 586, 591 (5th Cir. 2013).

[4] The attached document appears to be a marketing flyer, because it speaks directly to SMI's potential customers. (*See, e.g.*, Def.'s App. 797 ("VaultWorks . . . makes it easy for your branches to maintain optimal cash levels.").)

On April 6, 2010, Spear went forward with his demonstration of VaultWorks. The one-hour demonstration took place via an internet–telephone conference call involving Spear, Robertson, and two other ARGO representatives. (*Id.* at 2893.) As seen from Robertson's internal email following Spear's presentation, Spear, at minimum, divulged information concerning: (1) SMI's business, including (a) the number of SMI employees and its use of an off-site developer, (b) Spear's desire to retire, (c) the number of bank branches using VaultWorks, (d) how SMI charges customers, (e) certain financial information, and (f) the asking price for VaultWorks; and (2) VaultWorks' functionality, including that it (a) is an internet-based program hosted on SMI's servers with no tie-in to customers' software, (b) tracks average ending balances and requires banks to limit surpluses on their own, and (c) calculates surpluses using the max cash ever given out in one day minus the branch's lowest ending cash balance. (Def.'s App. 802.) In addition, Spear asserts that he informed ARGO about "how data from an automated teller system was interfaced into VaultWorks directly,"[5] and provided details "about SMI's relationship with BancorpSouth." (Pl.'s App. 2893.)

After the demonstration, Robertson was under the impression that Spear would soon disclose more information, some of which could be confidential. (Def.'s App. 10.) Accordingly, Robertson emailed Spear a "mutual nondisclosure agreement" ("NDA") for SMI to review, sign, and return to ARGO, who would then do the same. (*Id.* at 10, 804-08.) Though Spear followed up that same day, April 6, indicating he would send Robertson "further info soon," he did not return or acknowledge

---

[5] While Spear makes this vague assertion in his Declaration regarding interfacing, he specifically indicates in his deposition that bank employees had to manually enter teller-generated data into VaultWorks. (Pl.'s App. 107-08.) This is consistent with the declaration of BancorpSouth's representative, who avers that "[a]n employee at each BancorpSouth branch would gather branch data from [the teller system] . . . and input the data . . . on a daily basis into VaultWorks." (Def.'s App. 918.)

the NDA at that time. (*Id.* at 810.)

About a week later—April 15, 2010—Spear and Robertson met for lunch. According to Spear, "[t]he conversation focused on ARGO's integration of VaultWorks, SMI's current customers, SMI's prospective customers, and the structure of the potential acquisition, among other things." (Pl.'s App. 2893.) The following week—April 21, 2010—Spear emailed Robertson that he was "working on [getting Robertson] more info" soon, and attached to the email "some of [SMI's] marketing flyers from [its] direct mail campaigns" for ARGO to review. (Def.'s App. 818.) These flyers appear to contain illustrative screen-shots of VaultWorks alongside descriptions of the program's basic functionality and the benefits it offers banks. (*Id.* at 818-23.)

On April 28, 2010, Spear emailed Robertson again, apologizing he was "slow in getting info over" but assuring Robertson that SMI remained interested. (*Id.* at 825.) Spear attached to this email a signed copy of the NDA that Robertson had sent three weeks earlier, with an "effective" date of April 28, 2010. (*Id.* at 825-27.) In his email, Spear asked that Robertson sign the attached NDA and return it to Spear, who would then send "the customer info [Robertson] requested." (*Id.* at 825.) On May 3, 2010, Spear followed up with Robertson by re-sending the partially-executed NDA "to be sure" Robertson received it. (*Id.* at 829.) When Robertson again did not respond, Spear sent another email on May 14, 2010 in an attempt "to follow up on [ARGO's] initial enthusiasm," asking Robertson to contact Spear "as soon as possible" in light of the interest one of ARGO's "major competitors" had expressed. (*Id.* at 834.) Robertson responded on May 16, 2010 that he would get "the executed NDA back to [Spear]" upon his "return to Dallas." (*Id.*) He also asked Spear to "mail [two] original copies of the NDA," which Robertson said he would as well. (*Id.*) Neither party followed through on Robertson's suggested course of action in this email.

- 9 -

In the parties' final two correspondences, Spear emailed Robertson on May 26 and 27, 2010 asking if ARGO would still be interested in doing business with SMI. (*Id.* at 836-37.) Apparently Robertson "had grown skeptical of the benefits of any business relationship with SMI," and as such, "did not pursue any further discussion with Mr. Spear after May 2010." (Def.'s App. 13.)

  D.  *ARGO Implements CIO at BancorpSouth*

Meanwhile, ARGO continued to pursue a deal to license CIO to BancorpSouth. After informing BancorpSouth that CIO could be integrated with its text-based teller solution in April 2010, Robertson was invited to BancorpSouth's central offices on June 23, 2010 to further present CIO's capabilities. (*Id.* at 14-15.) The two sides continued their discussions until November 2010, when BancorpSouth's Technology Steering Committee approved a proposal to implement CIO. (*Id.* at 963.) On January 3, 2011, both parties signed an agreement licensing ARGO's CIO Solution to BancorpSouth. (*Id.* at 14-15, 845-46.)

To prepare for the ensuing implementation of CIO, representatives from ARGO and BancorpSouth attended a Kickoff Meeting in Tulpelo, Mississippi on January 25 and 26, 2011. (*Id.* at 864.) At the Meeting, BancorpSouth gave about a one hour presentation on how it currently handled cash management issues using VaultWorks. (*Id.*) During the presentation, BancorpSouth showed ARGO's representatives a number of PowerPoint slides containing screen-shots of its VaultWorks interface screens. (*See* Pl.'s App. 241-260.) According to ARGO's Kerri Williams, who was present at the time, the purpose of this presentation "was to help ARGO understand what would need to change at BancorpSouth as it implemented ARGO's CIO Solution." (Def.'s App. 864.)

After the Kickoff Meeting, ARGO began implementing CIO at BancorpSouth. The CIO Solution's forecasting program needed at least six months of cash usage data before a pilot version

could be made operational. (*Id.* at 864-65.) But since BancorpSouth's BANKPRO Teller system did not make a record of this cash usage data, new data had to be generated and fed into CIO, pushing the expected start date back to July or August 2011. (*Id.* at 865.) This date was pushed back even further, to about November 2011, when ARGO discovered an error in May 2011 that rendered the previously collected data unreliable. (*Id.*)

ARGO ran into another setback later in the implementation process. Specifically, ARGO noticed that a few of the BancorpSouth branches were generating anomalous cash usage data. (*Id.*) In an effort to "understand these anomalies, and understand whether there was an error in data or truly anomalous branch cash activity," ARGO examined BancorpSouth's "own data showing the cash in an cash out amounts for its branches for given time periods." (*Id.* at 866.) This data was delivered to ARGO via BancorpSouth's screen-shots of VaultWorks, which contained the cash usage history ARGO needed to confirm and understand the anomalies. (*See id.* at 879-909.) BancorpSouth emailed these screen-shots to ARGO on five separate occasions between September 2011 and January 2012. (*See id.*)

With CIO in place, BancorpSouth notified SMI on January 12, 2012 of its intention not to renew the VaultWorks Agreement, which had most recently been extended on March 1, 2010. (*Id.* at 1004, 1051.) In accordance with the terms of this extension, the VaultWorks Agreement expired by the end of February 2012. (*Id.* at 1050.)

E.    *Procedural History*

After receiving BancorpSouth's notice not to renew, SMI's counsel sent a letter to Defendants on February 16, 2012, demanding, among other things, that ARGO cease and desist from marketing or operating CIO and that Defendants grant SMI the opportunity to "inspect, test,

and analyze [CIO] . . . [to] determine whether the misappropriation of SMI's trade secrets has occurred." (*Id.* at 847-49.) In the written exchanges that followed, Defendants presented SMI with documentation that they believed showed no misappropriation occurred. (*See id.* at 852-60.) Defendants noted they "simply cannot give SMI personnel ( . . . a competitor of ARGO's) direct access to ARGO's source code, documentation or other proprietary materials" as SMI requested. (*Id.* at 859.) Defendants did, however, on two occasions propose that SMI hire an agreed-upon third-party expert to inspect VaultWorks and CIO in order to alleviate SMI's concerns while preserving the confidentiality of the parties' proprietary information. (*Id.* at 855, 859.) SMI never responded to Defendants' proposal or to the final letter sent by Defendants' counsel on February 24, 2012.

About six months later—August 10, 2012—SMI filed suit in state court against Defendants, who later removed to this Court. (*See* Notice Removal, Doc. 1.) In its First Amended Complaint ("FAC") (doc. 7) now before the Court, SMI asserts nine Texas state law claims, all related to Defendants' purported use of SMI's trade secrets and proprietary information, including the following claims: trade secret misappropriation, Texas Theft Liability Act, unjust enrichment, fraud (ARGO only), constructive fraud, breach of contract (BancorpSouth only), tortious interference with a contract (ARGO only), unfair competition (ARGO only), and civil conspiracy. (FAC ¶¶ 42-82.) Among other things, SMI requests in relief a permanent injunction, compensatory damages, and/or exemplary damages under Texas Civil Practice & Remedies Code § 41.003. (*Id.* ¶¶ 83–91.) On top of denying liability, Defendants asserted various affirmative defenses in their Answers to SMI's FAC (docs. 31, 32), including that SMI's state law claims are preempted by the Federal Copyright Act, 17 U.S.C. § 301(a).

After nearly a year of discovery, the parties filed cross-motions for summary judgment that

are now pending before the Court. SMI's Motion for Summary Judgment (Partial) (doc. 92) asks the Court to enter summary judgment in its favor on certain affirmative defenses raised by Defendants. Defendants' Motion for Summary Judgment (doc. 94), on the other hand, asserts that summary judgment should be entered in its favor on each of SMI's state law claims. Both parties filed their respective responses and replies to these cross-motions, which are now ripe for resolution. Because it finds, for the reasons that follow, summary judgment in Defendants' favor appropriate on each of SMI's claims, the Court need not address SMI's Motion for Summary Judgment (Partial) or the parties' arguments regarding Defendants' affirmative defenses.

## II.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law,'" and a dispute is "genuine" when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In analyzing whether a dispute is "genuine," courts "consider all facts and evidence in the light most favorable to the nonmoving party [,] . . . draw all reasonable inferences in favor of the nonmoving party [,] . . . [and] disregard all evidence favorable to the moving party that the jury is not required to believe." *Haverda v. Hay County*, 723 F.3d 586, 591 (5th Cir. 2013) (quotation marks and internal citations omitted).

Under the well-established procedures governing summary judgment, the movant "bears the

initial responsibility of informing the district court of the basis of its motion, and identifying those portions of" the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the non-movant bears the burden of proving such material facts at trial, the movant satisfies its summary judgment burden either by affirmatively showing the non-movant's inability to establish such material facts or by "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Local*, 745, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)). Once the movant fulfills its initial responsibilities, "the burden shifts to the non-movant to produce evidence of the existence" of a genuine dispute regarding the material facts at issue. *Bayle*, 615 F.3d at 355.

## III.

## EVIDENTIARY OBJECTIONS

Before reaching its analysis, the Court briefly addresses Defendants' Objections to Plaintiff's Summary Judgment Response Evidence (doc. 137). The procedural rules governing summary judgment provide that parties "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Defendants object to three pieces of evidence offered by SMI: (1) portions of Bill Spear's Declaration, (2) Peggy Hansen's Expert Report, and (3) SMI's Supplemental Response to ARGO's Interrogatory No. 2.

For the sake of efficiency, the Court finds these objections **MOOT** to the extent they concern evidence purportedly establishing the existence of SMI's trade secrets. As addressed below, the Court assumes SMI has established the existence of its trade secrets, and as such, it need not determine whether it may consider SMI's evidence for this purpose.

- 14 -

That leaves just two material objections for the Court's resolution. First, Defendants object to paragraph 29 of Spear's Declaration, which states that Spear "believe[s] BancorpSouth and ARGO have in their possession, custody, or control, without SMI's consent, SMI's [t]rade [s]ecrets and other confidential information pertaining to VaultWorks." (Pl.'s App. 2890.) Defendants claim this portion of Spear's Declaration is "conclusory, not based on personal knowledge, and unsupportable." (Def.'s Objection 3.) Second, Defendants also object to Hansen's "suggestion that Defendants misappropriated [SMI's] trade secrets" in her Expert Report as being unsworn testimony, "not based on personal knowledge . . . , and contain[ing] ultimate legal conclusions." (*Id.* at 5.) Both objections are without merit.

Rule 56(c)(4) provides that a "declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Though the Court takes note of the fact that Spear and Hansen have not personally witnessed Defendants' alleged misappropriation or viewed any specific trade secrets purportedly embodied in CIO, neither witness' declaration actually asserts facts beyond their personal knowledge. Spear specifically states that he merely "believe[s]" Defendants took SMI's trade secrets, not that he actually knows they did. Likewise, Hansen declares that she has "personal knowledge of the opinions and conclusions contained in [her] report," and lists the materials she considered in reaching these conclusions. (Pl.'s App. 34.) This is enough for a qualified expert to state her opinion as to whether an event, which she does not have first-hand knowledge of, occurred.[6]  The evidentiary weight it is

---

[6] *See Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 476 (S.D. Tex. 2009) ("[An expert] witness need not have observed or participated in the gathering of the data underlying his

assigned by the court is another matter.

The Court similarly rejects the other grounds Defendants raise for excluding Hansen's opinion as it relates to their alleged misappropriation. First, though Hansen's report is unsworn, she declares, "under penalty of perjury," that her statements therein are "true and correct" (*id.*), which is all that the law requires.[7] Second, Hansen's opinion that "BancorpSouth and ARGO worked together in secret over a long period of time to create a product that now competes with [VaultWorks]" is an admissible factual—not legal—conclusion. (*Id.* at 33.) Again, this is merely Hansen's opinion, the strength of which is diminished by her failure to review CIO in relation to VaultWorks to determine how Defendants supposedly used SMI's trade secrets. But this does not render the proof inadmissible. Accordingly, the Court **OVERRULES** Defendants' objections to the extent they seek to exclude SMI's evidence purportedly showing that Defendants misappropriated SMI's trade secrets.

## IV.

## ANALYSIS

SMI's nine Texas state law claims center on the misappropriation of its trade secrets, which Defendants supposedly stole in order to build a competing cash management solution and pull business away from SMI. SMI identifies forty-eight trade secrets that Defendants allegedly misappropriated and breaks the forty-eight down into the following two general categories:

---

opinion. Rather, the personal knowledge requirement hinges on whether the expert personally analyzed the data that was made known to him and formed an expert opinion based on his own assessment of the data within his area of expertise.") (internal citations and quotations omitted).

[7] *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("28 U.S.C. § 1746 . . . permits unsworn declarations . . . if the statement contained therein is made 'under penalty of perjury' and verified as 'true and correct.'").

       <u>Technical Data and Information</u>, including . . . the selection of categories of input data used by VaultWorks; "Black Box" formulas, algorithms, and methods of operation used in VaultWorks; selection of categories of output data to be generated by VaultWorks; customer preferences regarding key output data; customer preferences regarding output data to include in reports; and customer preferences regarding organization of output data in reports; and

       <u>Business Information</u>, including . . . customer lists; . . . customer contacts; marketing strategies; budgets, forecasts and business plans; cost and pricing information for VaultWorks; information about SMI personnel; and financial information about SMI.

(Pl.'s Resp. 5-6.)

       Defendants move for summary judgment, arguing that "[n]one of SMI's claims are sustainable absent a showing of trade secret misappropriation," and that SMI cannot make such a showing. (Def.'s Mot. 14.) Defendants maintain that SMI cannot establish its trade secret misappropriation claim, and by extension its other eight claims, first, because the evidence does not reasonably show that any of SMI's trade secrets were misappropriated, and second, because the evidence shows that SMI's nine state law claims are preempted by the Copyright Act. Since the Court agrees with Defendants on the first of these grounds, it need not address the second.

       A.    *Trade Secret Misappropriation*

       To prove its trade secret misappropriation claim under Texas law, SMI must show: "'(a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff.'" *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013) (quoting *Phillips v. Frey*, 20 F.3d 632, 627 (5th Cir. 1994)). Though Defendants challenge the first and third elements of SMI's claim, the Court only addresses SMI's failure to establish the third requirement—that SMI

demonstrate Defendants' unauthorized "use" of its trade secrets.[8]

Under Texas law, "'[u]se of a trade secret means commercial use, by which a person seeks to profit from the use of the secret.'" *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007) (quoting *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 464 (Tex. App. 2004)). This definition broadly covers "'[a]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant.'" *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012) (quoting *Gen. Universal Sys.*, 500 F.3d at 450).

Here, SMI's theory of liability is that ARGO, "with BancorpSouth's consent, guidance and active participation, . . . knowingly and intentionally created a cash management system to compete with VaultWorks using SMI's Trade Secrets." (FAC ¶ 38.) SMI re-asserts this theory in its Response to Defendants' Motion, arguing that the evidence shows Defendants "used" SMI's trade secrets in the "development of [ARGO's CIO] system to compete with VaultWorks," and similarly, "to validate ARGO's CIO product while it was being created." (Pl.'s Resp. 18.) These alleged actions clearly fall within the broad range of activities that constitute "use" under Texas law. The question remains, however, whether SMI has supported its "use" allegations with sufficient proof.

In their Motion, Defendants argue, at length, that no genuine factual dispute exists regarding their alleged "use" of SMI's trade secrets. (*See* Def.'s Mot. 14-21.) They cite two general shortcomings on SMI's part. First, they assert that SMI has no evidence demonstrating Defendants used its trade secrets in any way. Second, Defendants highlight a wealth of affirmative evidence that they believe shows that ARGO developed CIO on its own and then implemented the solution at

---

[8] The Court, therefore, assumes, without deciding, that SMI's purported trade secrets are, in fact, secrets entitled to protection under Texas law.

BancorpSouth without using any of SMI's proprietary information.

In its Response, SMI essentially concedes it has no direct evidence supporting the third element of its claim, and instead relies on the principle that the Court "may consider circumstantial evidence concerning similarity of design plus access to the design to infer use by a defendant of a trade secret." (Pl.'s Resp. 17.) Then, over the course of one short paragraph, SMI argues that the circumstantial evidence in this case shows Defendants did indeed use its trade secrets in the development and validation of CIO. (*See id.* at 18.)

Despite the non-binding and otherwise distinguishable authority SMI cites in support,[9] the Court agrees with SMI that "use" may be established purely through circumstantial proof, and more specifically, through the access–plus–similarity test SMI proposes. Although the Court is unaware of a Texas Supreme Court opinion explicitly discussing either of these issues, at least one Texas appellate court has held that "[e]vidence of a similar product may give rise to an inference of actual use under certain circumstances."[10] Moreover, the comments to § 40 of the Restatement (Third) of Unfair Competition—which, according to the Fifth Circuit, the Texas Supreme Court is likely to adopt[11]—provide that "proof of the defendant's knowledge of the trade secret together with

---

[9] As Defendants note, SMI relies exclusively on a Fourth Circuit case, *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 561 (4th Cir. 1990), which does not even address the issue of what circumstantial evidence suffices to show "use" in trade secret cases. Rather, *Eden* simply mentions the difficulty of proving misappropriation as a justification for non-compete agreements.

[10] *Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App. 2008) (citing *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002)), *accord Aspen Tech., Inc. v. M3 Tech., Inc.*, — Fed. Appx. —, 2014 WL 2210691, at *5 (5th Cir. May 29, 2014) (unpublished).

[11] *See Bohnsack*, 668 F.3d at 279 (citing *Gen. Universal Sys.*, 500 F.3d at 450 n. 4); *see also Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 438-39 (Tex. App. 2012) (noting "the Texas Supreme Court has acknowledged section 40 and other sections of" the Restatement (Third) of Unfair Competition in defining the trade secret elements).

substantial similarities between the parties' products or processes may justify an inference of use by the defendant." RESTATEMENT (THIRD) UNFAIR COMPETITION § 40 cmt. c. Even more, at least nine federal circuit courts have concluded that "trade secret misappropriation may be demonstrated by circumstantial evidence, such as access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design."[12] Accordingly, the weight of authority suggests SMI can rely exclusively on circumstantial evidence and the access–plus–similarity test to prove "use" for its trade secret misappropriation claim.

That said, it remains SMI's burden to produce enough circumstantial evidence for a juror to *reasonably* infer Defendants' use of the trade secrets at issue.[13] The Court takes up this issue below.

### 1.  Access and Similarity do not Reasonably Imply Defendants' "Use"

As mentioned, SMI maintains that evidence of Defendants' access to its trade secrets and similarities between VaultWorks and CIO reasonably suggest that Defendants used its trade secrets in the development and validation of CIO. (Pl.'s Resp. 18.)

With regard to access, SMI argues that the evidence shows "ARGO collaborated with BancorpSouth . . . regarding ARGO's development of its [CIO] system to compete with VaultWorks." (*Id.*) "During this time," according to SMI, BancorpSouth "exceeded [its] authorization under the VaultWorks Agreement by accessing VaultWorks for the unlawful purpose of (a) disclosing SMI's [trade secrets] relating to VaultWorks to ARGO by email or otherwise and

---

[12] *Contour Design, Inc. v. Chance Mold Steel Co., Ltd.*, 696 F.3d 102, 109 (1st Cir. 2012) (citing *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005), which cites cases from the Second, Third, Fourth, Seventh, Eighth, Ninth, and Federal Circuits).

[13] *See BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (affirming summary judgment order after concluding "the inference that the defendants ask this Court to make" from the evidence presented "is unreasonable").

(b) using, and allowing ARGO to use, VaultWorks to validate ARGO's CIO product while it was being created." (*Id.*) In support of these assertions, SMI presents evidence surrounding (1) Defendants' implementation of ARGO's CIO at BancorpSouth, including (a) emails between Defendants with VaultWorks' screen-shots displaying certain cash data recorded from select BancorpSouth branches across specific periods of time, (b) ARGO's Project Status Reports detailing the progress of CIO's implementation at BancorpSouth between February 2011 and August 2012, and (c) an agenda for the CIO Kickoff Meeting in January 2011 along with the PowerPoint slides BancorpSouth presented to ARGO at the Meeting that contained screen-shots of VaultWorks; and (2) discussions between Bill Spear and Todd Robertson in April/May 2010, including (a) Robertson's internal email summarizing the information he learned from Spear's presentation on April 6, 2010, and (b) portions of Spear's Declaration detailing the information he conveyed to Robertson during their unrecorded conversations. (Pl.'s App. 2177, 2211-23, 2236-2826, 2839-60, 2862-84, 2892-94.)

Based on this evidence, the Court concludes that SMI has created a genuine dispute regarding whether Defendants accessed at least some of SMI's trade secrets.[14] A reasonable juror could find that ARGO had access to certain trade secrets connected to VaultWorks through BancorpSouth's somewhat detailed demonstration at the CIO Kickoff Meeting and Spear's declarations concerning his unrecorded demonstration of VaultWorks. The VaultWorks screen-shots also arguably gave ARGO access to certain trade secrets identified by SMI. Admittedly, the evidence of Defendants' access to SMI's specific trade secrets is hardly clear or concrete. But it seems sufficient

---

[14] The Court reaches this conclusion without giving any consideration to Defendants' copyright preemption defense, which could preclude SMI from asserting that certain elements of VaultWorks that Defendants had access to are trade secrets.

at this point, given the somewhat relaxed evidentiary standard courts employ when analyzing the access element of this test.[15]

For the similarity portion of this test, SMI contends that "documentary evidence produced by ARGO show[ing] side-by-side comparisons of VaultWorks and CIO," along with "ARGO's corporate representative's testimony regarding the similarities between VaultWorks and ARGO's CIO," make it "entirely reasonable for the jury to infer that ARGO used VaultWorks and SMI's [t]rade [s]ecrets." (Pl.'s Resp. 18.) But the three pieces of evidence that SMI cites do not even support these assertions,[16] much less show any similarities whatsoever between CIO and VaultWorks.

First, SMI misrepresents its evidence purportedly supporting the similarity element. To begin, the documentary evidence produced by ARGO does not show Defendants making side-by-side comparisons of VaultWorks and CIO as SMI suggests. At best, the evidence SMI cites—(a) an email from BancorpSouth's Rufus Vanhorn to ARGO in September 2011 with a screen-shot of VaultWorks and ARGO for BancorpSouth's Colley Road branch and (b) ARGO's spreadsheet compiling cash usage data from VaultWorks and CIO at Colley Road—shows Defendants comparing the historical cash usage data recorded by the two solutions. This data is not one of SMI's trade

---

[15] *See Leggett*, 285 F.3d at 1361 ("On the issue of access, direct evidence is rarely available, thus requiring a reliance on circumstantial evidence."); *Sokol Crystal Products, Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) ("[T]he simple fact that [plaintiff] shipped its product to [defendant] would likely be sufficient evidence of access"); *Stratienko*, 429 F.3d at 601 (assuming plaintiff "produced sufficient evidence of access" while noting that "[i]t would be very burdensome to require [plaintiff] to demonstrate that a particular inventor or designer had access").

[16] For reference, the three specific pieces of evidence SMI cites to support its similarity assertions include: (a) an email from BancorpSouth's Rufus Vanhorn to ARGO with screen-shots of VaultWorks and CIO concerning cash usage data for BancorpSouth's branch located at Colley Road, (b) ARGO's spreadsheet compiling the historical cash usage data VaultWorks and CIO generated across a specific time period at the Colley Road branch, and (c) an excerpt of ARGO's Kerri Williams' deposition testimony. (*See* Pl.'s App. 2218-20, 2923-25, 1693.)

secrets—its BancorpSouth's own data entered into VaultWorks by BancorpSouth's representatives. Likewise, despite SMI's reference to "ARGO's corporate representative's testimony regarding the similarities between VaulWorks and ARGO's CIO" (*id.*), it offers no evidence in support of this proposition. Rather, it later cites a single line from the deposition of ARGO's Kerri Williams, and claims she "testified that VaultWorks was used to 'validate' CIO." (*Id.*) But in reality, this portion of Williams' testimony concerns what she understood Vanhorn's above-cited, September 2011 email to ARGO to mean, when he said that CIO's "recommendation" at the Colley Road branch "is right spot on." (Pl.'s App. 2218.) Specifically, Williams testified, in response to a question regarding Vanhorn's email: "I think he was telling us that the recommendation was spot on. I think he was validating CIO." (*Id.* at 1639.) This testimony, therefore, does not show that any proprietary information from VaultWorks was actually used to "validate" CIO as SMI misleadingly claims. In fact, just a few lines later, Williams even indicates she does not know "how" Vanhorn reached the "conclusion" that CIO's recommendation at Colley Road was spot on (*id.*), further demonstrating SMI's mischaracterization of her testimony.

Second, and perhaps most importantly, SMI's evidence does not reveal any specific similarities between CIO and VaultWorks that may suggest Defendants stole SMI's secrets. As the Sixth Circuit has noted, "[t]he analysis of similarity evaluates only relevant, innovative features, not all possible congruence." *Stratienko*, 429 F.3d at 602. SMI "must demonstrate similarity between [its] *secret idea* (not [its] product in general) and" ARGO's CIO. *Id.* (citing *Leggett & Platt, Inc.*, 285 F.3d at 1361). Here, SMI has identified over forty trade secrets that it claims Defendants stole to develop and validate a competing cash management solution. And yet, the only similarity between CIO and VaultWorks made apparent by the record is the general, cash management function they each

- 23 -

perform. Although SMI's expert—who never examined CIO or any of the documentation related to CIO produced by ARGO—notes that she has "never been offered" a solution like VaultWorks in her years of banking experience, she also admits that a simple "internet search to find competing solutions" turned up at least one other product offered by a third party not involved in this suit. (Pl.'s App. 33.) Even so, SMI never even asserts that this general similarity VaultWorks shares with CIO is one of the forty-eight secrets Defendants stole. And since "there is no evidence to establish any connection between this [general] feature and the allegedly misappropriated information," the Court cannot reasonably infer use. *Contour Design*, 696 F.3d at 110.

Third, the uncontroverted evidence shows a number of differences between VaultWorks and CIO. For example, a key feature of VaultWorks is the surplus cash calculation it provides banks. But not only is there no proof that CIO uses this calculation, the evidence shows that CIO provides banks with a very specific cash needs prediction generated by a complex forecasting engine that is unlike any known component of VaultWorks. Similarly, the solutions differ in how they interface with clients, with VaultWorks providing internet-based services while CIO's software is integrated directly with the bank's existing computer systems. Likewise, BancorpSouth representatives were required to manually input cash usage data into VaultWorks, while ARGO developed a cash extraction program for CIO that automatically draws cash usage data from a text-based teller solution. "In light of these difference, and the fact that the similarity lie only in" the most general features shared by the two solutions, "no inference of use arises." *Global Water Gr.*, 244 S.W.3d at 930.

Finally, SMI's appeal for a more lenient view of its circumstantial evidence is unavailing in these circumstances. As noted in *Eden*—the sole case SMI relies on—victims of trade secret

misappropriation often "must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences," which "must be balanced [against] defendants' witnesses who directly deny everything." *Eden*, 914 F.2d at 561 (quoting *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974)). But in this case, SMI made no effort to build a web of circumstantial proof around facts covered up by the Defendants. On the contrary, when SMI came to Defendants with its suspicions of misappropriation, Defendants openly attempted to address SMI's concerns. They first presented documentation showing CIO had been in the works years before ARGO came into contact with SMI, and even offered to have a third party expert review CIO and VaultWorks. This was SMI's chance to obtain the proof it now struggles to identify—proof of the specific characteristics that CIO and VaultWorks allegedly share. But SMI, instead, filed suit based on its unsubstantiated allegations. And despite nearly a year of discovery—including hiring two experts, neither of whom examined CIO or its related documentation—SMI continues to rely purely on its unfounded suspicions. Simply put, SMI, in the words of the Defendants, "has . . . elected to ignore CIO entirely, bury its head in the sand, and claim that the circumstantial evidence shows trade secret use." (Def.'s Reply 6.) Under these circumstances, the Court cannot conclude that SMI's scant evidence reasonably implies use.

### 2.   Other Evidence does not Reasonably Imply Defendants' "Use"

The Court also concludes, more generally, that the circumstantial evidence does not reasonably imply Defendants used any of SMI's trade secrets. As illustrated above, SMI relies exclusively on evidence showing Defendants' *access* to its trade secrets in an effort to demonstrate use. But whatever evidence of actual "use" that can be gleaned from this circumstantial evidence is diluted by Defendants' uncontroverted documentary evidence demonstrating the lawfulness of their

actions at all relevant times in this case.

For starters, the Defendants detail how, commencing in 2004, ARGO began developing a cash management solution to complement its teller solution. With a wealth of records and testimony, Defendants demonstrate how ARGO's CIO solution was fully developed, incorporating its own, independently-designed components, by 2009—well before ARGO came across any of SMI's secrets. SMI altogether ignores this detailed evidence submitted by Defendants. In doing so, SMI fails to cast any doubt on these facts established by Defendants or provide the Court with any reasonable basis to conclude that ARGO had any access or knowledge of SMI's trade secrets by the time CIO was made "Generally Available" for customers in 2009.[17]

With that, SMI cannot sustain its theory—that its trade secrets were used to develop, create, and/or validate CIO—unless it shows that Defendants somehow used its trade secrets to change, modify, or add to ARGO's pre-existing CIO solution. But the evidence does not suggest that ARGO capitalized on any of its limited points of access to SMI's information.

The record shows that ARGO had two limited points of access to SMI's Technical Data and Information trade secrets: Bill Spear's discussions with Todd Robertson and the screen-shots sent by BancorpSouth. Otherwise, there is no evidence suggesting ARGO had any other way of accessing any of SMI's proprietary information related to VaultWorks. SMI admits that VaultWorks is run on highly-guarded software that only Bill Spear, Chris Spear, and Chuck Lawson can access. Customers,

---

[17] SMI cites Bill Spear's Declaration, while discussing its tortious interference claim, as proof that "ARGO had no product similar to VaultWorks and had nothing in development regarding the cash management task" prior to Spear's conversation with Todd Robertson. (Pl.'s Resp. 22 (citing Pl.'s App. 2892)). But the Court need not credit Spear's "conclusory, self-serving statement" since Defendants present a wealth of documentary evidence showing just the opposite. *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996).

like BancorpSouth, can only access certain user interface screens using passwords that SMI provides to select bank employees. And there is no evidence BancorpSouth's representatives ever provided ARGO access to VaultWorks outside of the screen-shots BancorpSouth included in its PowerPoint presentation at the January 2011 Kick-off Meeting and emails sent to ARGO during the CIO implementation process between January 2011 and August 2012.

Additionally, there is no evidence suggesting ARGO used any of the information it gained from Robertson's April/May 2010 meetings with Spear to change or add to CIO's existing features. Spear, who admits having limited knowledge about computers and that he relies on Chuck Lawson to develop and maintain VaultWorks software, presented VaultWorks' basic functionality to Robertson and other ARGO personnel in a one-hour, internet-teleconference demonstration. Spear also sent Robertson marketing flyers concerning the basics of VaultWorks, and met in person with Robertson where they apparently discussed "ARGO's integration of VaultWorks, SMI's current customers, SMI's prospective customers, and the structure of the potential acquisition, among other things." (Pl.'s App. 2893.) It would be unreasonable to infer from this evidence that ARGO used the basic information Robertson learned about VaultWorks to somehow alter its fully functioning CIO solution.[18]

Third, the evidence similarly fails to suggest that ARGO modified CIO after gaining limited access to VaultWorks through BancorpSouth. Like Spear's demonstration, BancorpSouth's PowerPoint presentation, at most, offered ARGO insight into the basics of VaultWorks at a time

---

[18] *See Wilson v. Hasbro, Inc.*, No. 3:05-cv-457-R. 2009 WL 860355, at *7 (W.D. Ky. Mar. 30, 2009) ("Given that Defendants have submitted evidence that this concept was being considered by Hasbro [well before gaining access to the alleged trade secrets], it is difficult to characterize this [shared] feature as a relevant, innovative feature [for purposes of showing use].").

when CIO had been fully functioning for nearly two years. Moreover, Defendants' evidence shows that BacorpSouth gave this PowerPoint presentation for the perfectly legitimate reason of "help[ing] ARGO understand what would need to change at BancorpSouth as it implemented ARGO's CIO solution." (Def.'s App. 864.) The record also shows that ARGO never received a copy or record of these screen-shots even though BancorpSouth sent ARGO other documentation related to the Meeting. Likewise, the screen-shots BancorpSouth emailed ARGO during CIO's implementation also do not suggest ARGO used any of SMI's proprietary information. As Defendants explain, with documentary evidence in support, these screen-shots were sent for the historical cash data contained therein, which ARGO needed when confronted with cash usage anomalies at certain BancorpSouth branches. As mentioned, this data belonged to BancorpSouth, not SMI. Further, if Defendants were truly conspiring to steal trade secrets using these screen-shots, as SMI claims, then it makes no sense why they would exchange such limited views of VaultWorks in a way that is consistent with Defendants' reasonable explanation.

Finally, SMI fails to even present a theory as to how Defendants "used" the Business Information trade secrets Spear apparently disclosed to Robertson in April 2010. Certainly, information concerning SMI's customers, personnel, and financials could not have been used in the development or validation of CIO. And there is no evidence suggesting that ARGO otherwise used this information for commercial gain or otherwise. While BancorpSouth decided to use ARGO's CIO after its VaultWorks Agreement with SMI expired, the uncontroverted evidence shows that by the time Spear told Robertson about SMI's business, ARGO had done nearly all that it needed to do to sell BancorpSouth on its CIO solution, including two years of marketing the product to its customer of nearly twenty years. And there is nothing in the record to indicate that Robertson used any of the

information he learned from Spear in ultimately closing ARGO's licensing agreement with BancorpSouth.

In sum, the Court finds that SMI failed to present sufficient evidence from which a reasonable juror could infer Defendants' "use" of the trade secrets at issue. And since SMI has not established a genuine dispute regarding an essential element of its trade secret misappropriation claim, the Court concludes that summary judgment in Defendants' favor is appropriate.

B.    *SMI's Other Claims*

Defendants assert that "all of SMI's claims require a finding of trade secret misappropriation," and therefore, "its claims should be dismissed if its trade secret misappropriation claim fails." (Def.'s Mot. 31.) The Court agrees. But for good measure, the Court examines the specific legal grounds on which SMI's other eight claims fail in light of SMI's insufficient evidence of use. Again, the Court offers no opinion on the various legal deficiencies raised by Defendants that are not addressed below.

1.    Texas Theft Liability Act

A plaintiff may establish a claim for theft of trade secrets under the Texas Theft Liability Act ("TTLA") by showing (1) that the defendant knowingly (a) stole the plaintiff's trade secret, (b) made a copy of an article representing the trade secret, or (c) communicated or transmitted a trade secret, and (2) that the plaintiff sustained damages as a result. *See* TEX. PENAL CODE § 31.05; TEX. CIV. PRAC. & REM. CODE § 134.005(a).

First, SMI cannot show Defendants "stole" any trade secrets. To "steal" means to acquire by "theft," which the TTLA defines as "unlawfully appropriating property or unlawfully obtaining services." TEX. PENAL CODE § 31.07(7) (defining "Steal"); TEX. CIV. PRAC. & REM. CODE § 134.002(2). "Appropriate" means "bring about a transfer or purported transfer of title to or other

nonpossessory interest in property, whether to the actor or another; or [ ] to acquire or otherwise exercise control over property other than real property." TEX. PENAL CODE § 31.01(4). Here, SMI relies on the same deficient arguments and evidence it submitted to show "use" in an effort to demonstrate that Defendants "exercised control over SMI's [t]rade [s]ecrets." (Pl.'s Resp. 31.) Thus, for reasons previously discussed, SMI cannot establish that Defendants stole its trade secrets.

Second, SMI makes no effort to demonstrate that Defendants made a copy of its trade secrets. Defendants met their initial burden by demonstrating that no genuine dispute exists regarding their copying of SMI's trade secrets. (Def.'s Mot. 32.) Since SMI does not counter Defendants' argument in its Response, the Court finds no genuine dispute regarding this issue.

Lastly, SMI's assertions regarding Defendants' communication of SMI's trade secrets are also deficient. SMI claims that its evidence "shows that BancorpSouth communicated and transmitted SMI's [t]rade [s]ecrets to ARGO by email and oral presentation." (Pl.'s Resp. 31.) But even assuming these communications truly contained its trade secrets, SMI would not be able to show that it sustained damages as a result in light of its failure to establish that ARGO used any of these trade secrets. Without any evidence showing ARGO did anything with the trade secrets BancorpSouth allegedly sent, to conclude does not square with the summary judgment record that SMI was harmed by these inconsequential communications. Therefore, summary judgment is proper for SMI's TTLA claim.

### 2.   Unjust Enrichment

"A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992). Here, SMI essentially copies and pastes the same

assertions it made to show "use" in an effort to demonstrate that Defendants took "unfair advantage" of SMI's trade secrets to unjustly enrich themselves. (*See* Pl.'s Resp. 21.) As such, the Court agrees with Defendants that since "SMI has no evidence to show that its trade secrets were used in the development of CIO, there was no unjust enrichment." (Def.'s Mot. 34.)

3. <u>Fraud (Against ARGO)</u>[19]

To succeed on a claim of fraud, a party must show:

> (1) a material misrepresentation was made; (2) it was false; (3) when the misrepresentation was made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in reliance on the misrepresentation; and (6) the party suffered injury as a result.

*Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 292 (Tex. App. 2000) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). Among the deficiencies raised by Defendants, the Court agrees with their assertion that "SMI's claim fails because SMI has no evidence . . . of any injury." (Def.'s Mot. 35.)

SMI's theory of liability here is that Robertson, acting on ARGO's behalf, made certain material misrepresentations regarding ARGO's interest in VaultWorks during his discussions with Spear. (*See* FAC ¶¶ 55–56.) SMI maintains that its evidence shows that Robertson "made these misrepresentations to encourage [Spear] to disclose [SMI's] confidential information and [t]rade [s]ecrets . . . that [Spear] reasonably relied on [Robertson's] representations" by disclosing such information, and "that SMI suffered damages as a result of these misrepresentations." (Pl.'s Resp. 20.)

---

[19] For certain claims, such as this one, SMI only brings charges against one of the two Defendants, which the Court parenthetically notes, as it did here.

The evidence SMI cites that supposedly shows it suffered damages as a result of Mr. Robertson's misrepresentations are the Expert Report and Supplemental Expert Report of SMI's expert witness Saul Soloman, who SMI retained for his opinion on certain economic damages SMI supposedly sustained. (Pl.'s App. 43-54, 69-90.) In both reports, Soloman indicates that his damages calculations relate exclusively to "the amount of unjust enrichment for each of the Defendants resulting from the alleged misappropriation." (*Id.* at 43; *see also id.* at 70.) But the "alleged misappropriation" or "use" of SMI's trade secrets, which Soloman bases his calculations on, has not been established. Moreover, the Court cannot conclude that SMI suffered injuries related to its fraudulently-induced disclosure of information, when the alleged recipient, ARGO, has not been shown to have used the disclosed information in any way. Accordingly, summary judgment is also appropriate for SMI's fraud claim.

### 4.   Constructive Fraud

Under Texas law, constructive law involves "the breach of some legal or equitable duty which . . . the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex.1964). Actual fraud (discussed above) and constructive fraud (at issue here) are related doctrines, with the key difference being that the actual fraud "usually involves dishonesty of purpose or intent to deceive," whereas constructive fraud does not involve any inquiry into the defendant's mental state. *Id.* Most important to this discussion, the doctrines of actual and constructive fraud both require plaintiffs to show that the defendant's actionable conduct caused harm.[20]

---

[20] *See, e.g., Shwiff v. Priest*, 650 S.W.2d 894, 903 (Tex. App. 1983) ("Beyond his [insufficient] allegations of fraud and unjust enrichment, Shwiff has not shown how he was damaged."); *In re Estate of Kuykendall*, 206 S.W.3d 766, 771 (Tex. App. 2006) (holding that "the complete absence of evidence of damages entitled [the defendant] to an instructed verdict" on the actual and constructive fraud claims).

Here, SMI contends that Defendants breached a legal duty owed to SMI through their "numerous self-dealing and deceitful transactions" that resulted in SMI suffering "economic harm in that SMI lost its largest customer," BancorpSouth. (Pl.'s Resp. 20-21.) But even assuming a legal duty existed between SMI and each Defendant and that Defendants breached their respective duties, SMI's claim would fail because it relies on the same insufficient theory and evidence to show damages that it used for its actual fraud claim, and by extension, for the third element of its trade secret misappropriation claim. Therefore, summary judgment is, likewise, appropriate on SMI's constructive fraud claim.

### 5.    Breach of Contract (Against BancorpSouth)

To establish a breach of contract claim under Texas law, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages. *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. 2003). SMI asserts that BancorpSouth disclosed proprietary information to ARGO in violation of the VaultWorks Agreement and that "SMI was damaged by BancorpSouth's breaches." (Pl.'s Resp. 22.) As with its fraud and constructive fraud claims, however, SMI cannot establish that it was damaged by BancorpSouth's disclosures, since, as discussed, SMI––via the summary judgment record––cannot show that ARGO subsequently used any of the proprietary information that BancorpSouth allegedly sent. Since SMI is unable to sustain its breach of contract claim without proving damages,[21] summary judgment in Defendants' favor is appropriate.

---

[21] *See Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 89 (Tex. App. 2004) ("A breach of contract claim cannot survive if the plaintiff was not damaged by the breach.").

6.      Tortious Interference with a Contract (Against ARGO)

Under Texas law, a plaintiff must prove the following elements in order to sustain a tortious interference with a contract claim: "(1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred." *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995). To show ARGO's interference with its VaultWorks Agreement, SMI relies entirely on the same insufficient evidence it cited to show Defendants' "use" of its trade secrets. To illustrate, SMI asserts that "ARGO interfered with [the VaultWorks Agreement] by using SMI's [t]rade [s]ecrets, particularly business information, to induce BancorpSouth to license CIO . . . and by using [SMI's other trade secrets] to create a competing product." (Pl.'s Resp. 22.) But again, SMI has not established a genuine dispute with regard to this material fact, and as such, summary judgment is warranted for this claim as well.

7.      Derivative Claims: Unfair Competition (Against ARGO) and Conspiracy

Lastly, SMI's unfair competition and conspiracy claims depend on SMI establishing one or more of the claims previously discussed.[22] But since it failed to do so, SMI's derivative claims must also fail. Accordingly, the Court also finds summary judgment appropriate on SMI's unfair competition and civil conspiracy claims.

---

[22] *See Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting Schoellkopf v. Pledger, 778 S.W.2d 897, 904–05 (Tex. App. 1989)) ("'Without some finding of an independent substantive tort or other illegal conduct, [Texas courts] hold that liability cannot be premised on the tort of unfair competition.'"); *RTLC AG Products, Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App. 2006) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996) ("Civil conspiracy is a derivative tort and a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.").

## V.

## CONCLUSION

For the foregoing reasons, the Court finds SMI has failed to establish that genuine factual disputes exist for certain essential elements of its nine Texas state law claims, and as such, summary judgment in Defendants' favor is warranted. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (doc. 94). All other outstanding motions before the Court—including SMI's Motion for Summary Judgment (Partial) (doc. 92), Defendants' Motion to Strike (doc. 119), Defendants' Motion to Strike Plaintiff's Proffered Experts (doc. 130), and Defendants' Motion in Limine (doc. 170)—are declared **MOOT** in light of this Order.

In conclusion, it is **ORDERED**, **ADJUDGED**, and **DECREED** by the Court that Plaintiff take nothing by their suit against the Defendants and that this suit be, and is hereby, **DISMISSED WITH PREJUDICE** on the merits.

SO ORDERED

SIGNED: June 11, 2014.

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE